UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | 5:09-CR-7 |
| | § | |
| TERRACE RAYNARD SHELBY | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for Assignment of Duties to United States Magistrate Judges, Defendant's Second Amended Motion to Suppress Evidence (Docket Entry # 26) was referred to the Honorable Caroline M. Craven for the purpose of preparing a report and recommendation. The Court, having reviewed the relevant briefing and hearing arguments of counsel November 9, 2010, recommends the motion be **DENIED**.

## I.

## BACKGROUND

On December 18, 2008, Terrace Raynard Shelby ("Defendant") was pulled over in Bowie County, Texas by Troopers Justin Hilton and Josh Vera of the Texas Department of Public Safety. A subsequent search of Defendant's vehicle resulted in the seizure of approximately 1.89 kilograms of cocaine. On May 6, 2009, Defendant was indicted with possession with intent to distribute approximately 1.89 kilos of cocaine.

## II.

## DEFENDANT'S MOTION TO SUPPRESS

On October 27, 2010, Defendant filed his current motion to suppress, asserting his Fourth

Amendment rights under the United States Constitution were violated because his vehicle was searched and seized without a warrant, without probable cause, or without reasonable suspicion. Defendant further agues that he was detained for an unreasonable amount of time, and any items found during the allegedly illegal search of his vehicle should be suppressed.

## III.

## THE NOVEMBER 9, 2010 HEARING

At the November 9, 2010 hearing, the Government introduced as evidence a DVD of the stop ("Exh. 1")[1] as well as Trooper Hilton's Offense Report ("Exh. 2"). Both Troopers Hilton and Vera testified at the hearing. The evidence reveals as follows.

On December 18, 2008, Trooper Hilton and his partner Trooper Vera were on routine patrol, driving eastbound on Interstate 30 ("I-30") in a marked Texas Highway Patrol unit with overhead lights. Trooper Hilton was driving, and Trooper Vera was in the front passenger seat of the patrol car. Trooper Hilton testified he graduated from the police academy about two months before the night in question; he had been patrolling in the field for approximately two months before pulling over Defendant's vehicle in December of 2008. Trooper Hilton has had training in making drug interdiction stops.[2]

At approximately 10:00 p.m. on the night in question, Trooper Hilton observed a white Chrysler speeding 68 mph in a 65 mph zone. Trooper Hilton further observed the car drive onto the shoulder while traveling eastbound on I-30. Trooper Hilton activated the overhead lights and

---

[1] The DVD's running time is 20 minutes and 36 seconds and depicts the December 18, 2008 traffic stop, search, and arrest.

[2] On cross examination, Trooper Hilton testified had just started his six-month field training with Trooper Vera on the date in question.

initiated a traffic stop of Defendant's car. Trooper Hilton approached Defendant's vehicle on the passenger's side. (Exh. 1, 21:52:09-18). Defendant's mother was riding in the front passenger's seat. Trooper Hilton leaned inside the front passenger's window and informed Defendant that he had observed him speeding and driving on the shoulder, so he had pulled Defendant over to make sure that everything was all right. (Exh. 1, 21:52:09-18).[3] Trooper Hilton asked for Defendant's driver's license. Trooper Hilton then asked Defendant if the vehicle was his, and Defendant informed him that it was a rental car. (Exh.1, 21:52:23-33). Trooper Hilton asked if Defendant had the rental agreement.

Because it was hard to hear leaning inside the passenger window as well as for safety reasons, Trooper Hilton asked Defendant to exit the vehicle and step to the rear of his vehicle. Trooper Hilton again asked Defendant for the rental car agreement. Defendant had already provided Trooper Hilton with his driver's license and proof of insurance, but Defendant had to return to the car to retrieve the rental agreement.

While standing near the rear of the vehicle, Trooper Hilton asked Defendant about the rental agreement and his trip. (Exh. 1, 21:52:33 to 21:54:26). Defendant stated he rented the vehicle, and he and his mother were driving from Converse, Texas to Ohio. Trooper Hilton examined the rental agreement to confirm if Defendant actually rented the vehicle, and he ascertained that Defendant had rented the car. Trooper Hilton advised Defendant that he was stopped for speeding and for swerving onto the shoulder, and they wanted to see if he was alright.

As Trooper Hilton looked at the rental agreement, he noticed the vehicle was rented on December 15, 2008 at 4:18 p.m. in Springfield, Ohio. The trip from San Antonio to Springfield,

---

[3] Trooper Hilton did not initially have a suspicion that Defendant was carrying drugs.

Ohio is approximately 1,300 miles, and the vehicle had been rented for only two days, being due back on December 17, 2008 at 3:00 p.m. In his report, Trooper Hilton noted that the vehicle was rented for 48 hours, and the drive would have taken approximately 36 hours round trip. Trooper Hilton determined that Defendant was fine and able to drive. Trooper Hilton also ascertained that Defendant was not an intoxicated driver. However, Trooper Hilton noted in his report that Defendant was showing signs of nervousness; his voice was shaky; he could not keep his hands still; he would take his hands in and out of his pockets, stretching to relieve stress, rubbing his face, and avoiding eye contact. (Exh. 2 at pg. 3).

Trooper Hilton handed Defendant some documents and told Defendant he was going to issue a warning. Trooper Hilton returned to his patrol car. Trooper Vera had been waiting in the car throughout Trooper Hilton's encounter with Defendant and could hear parts of the conversation from inside the patrol car.[4] Trooper Vera began to question Trooper Hilton about his encounter with Defendant. Trooper Hilton advised Trooper Vera that Defendant was traveling to Ohio and that Defendant was okay to drive.

During this conversation, Defendant walked in front of the patrol car and stretched. According to Trooper Vera, Defendant had been acting nervous during his conversation with Trooper Hilton. Trooper Vera further testified that he observed Defendant stretch in a big manner, presumably in an attempt to relieve stress. Trooper Vera described such a stretch as a "felony stretch" based on his experience in law enforcement.[5] Trooper Vera also testified that Defendant's

---

[4] Trooper Vera was allowing Trooper Hilton to get acclimated to working by himself.

[5] Trooper Vera testified at the hearing as follows. He has been a trooper for the Texas Department of Public Safety for six years. Among other things, Trooper Vera's duties include criminal enforcement, drug enforcement, and DWIs. Field training officer certification, and he

hands were shaking when documents were returned to him. Trooper Hilton testified that Defendant's level of nervousness did not go down even after Defendant was advised that he would be receiving a warning.

Trooper Hilton gave Defendant's driver's license to Trooper Vera to run a check on the license. Trooper Vera ran the license through the system to make sure it had not been suspended. Defendant's license was cleared, but he had been arrested numerous times.

As Trooper Vera was checking Defendant's information, Trooper Hilton continued talking with Defendant. Trooper Hilton asked Defendant a series of questions. (Exh. 1, 21:54:37 to 21:56:21). Trooper Hilton asked Defendant about the rental car agreement, where he was coming from, his destination, how long he was going to visit, who he was going to visit, why he was going to visit, etc. Defendant explained that he was taking his mom back home to Springfield, Ohio from Converse, Texas, near San Antonio. When Trooper Hilton asked Defendant how his mother got to Texas, Defendant said he picked her up and brought her down to Texas to visit for a few days. Trooper Hilton asked Defendant how long his mother had stayed to visit, and Defendant stated "a couple of days." Trooper Hilton remarked that Defendant's mother was not staying for Christmas, and Defendant replied that his mom had some dogs and one of them was having problems having puppies. (Exh. 1, 21:54:37 to 21:56:21). Trooper Hilton then asked Defendant to wait while Trooper Vera wrote out Defendant's warning citation.

Trooper Hilton then approached the passenger's side window of the vehicle to talk to Defendant's mother. (Exh. 1, 21:56:22 to 21:57:25). Trooper Hilton asked her where they were

---

has been a field training officer for about four years. Trooper Vera has made about 30-40 arrests for drug interdiction. Trooper Vera also has his crash school certification.

coming from, and she stated "San Antonio." Trooper Hilton asked her where they were headed, and she stated "Springfield, Ohio." Trooper Hilton asked her if she was okay, and she mentioned her back. Trooper Hilton commented on the long drive. Trooper Hilton asked how long she had been in Texas. According to Defendant's mother, she had been in Texas a couple of days. (Exh. 1, 21:56:22 to 21:57:25). When Trooper Hilton asked Defendant's mother how she had gotten to Texas, she replied that she had "flown here." Trooper Hilton asked her why she was not flying back to Springfield, and she said she did not like to fly; flying was too hard on her back.

While Trooper Hilton spoke with Defendant's mother, Trooper Vera approached Defendant and asked if he was from Ohio, and Defendant confirmed this fact. (Exh. 1, 21:57:25). Trooper Vera remained with Defendant by the patrol car and asked Defendant further questions.

After their conversations with Defendant and his mother, both troopers regrouped in their patrol car to share the information they had gathered from their conversations. Trooper Hilton informed Trooper Vera that Defendant's mother had verified the same thing Defendant had told him. Trooper Vera asked Hilton whether he was sure. Trooper Vera commented on Defendant's criminal background which included prior arrests for drug possession and money laundering charges. (Exh. 1, 21:58:17 to 22:00:24). They also discussed the rental agreement and discrepancies in Defendant's statements and those of his mother. (Exh. 1, 21:58:17 to 22:00:24). Trooper Vera indicated that he found Defendant's responses and the rental car agreement suspicious.

Based on his experience, Trooper Vera was suspicious because the car was rented in Ohio three days before the stop. Defendant's mother had explained that she had flown to Texas whereas Defendant had said he had picked her up in Ohio, and this discrepancy was significant to him. During Trooper Hilton's conversation with Defendant, Trooper Vera observed Defendant acting

6

nervous; he stretched big ("felony stretch") trying to relieve stress, and his hands were shaking. Trooper Hilton also testified that he had a reasonable suspicion that some sort of criminal activity was going on.

Trooper Vera told Trooper Hilton to ask Defendant whether there was anything illegal in the vehicle and then to ask for consent to search. Trooper Vera specified that Trooper Hilton was not to ask "may I look?" but rather "can I search the vehicle?" Trooper Hilton got out of the patrol car and asked Defendant about his criminal history. Trooper Hilton asked Defendant if he had been arrested before, and Defendant admitted to having a criminal history. (Exh. 1, 22:00:25 to 22:02:08). Defendant did not willingly offer information, but he admitted to the charges; he did not deny the money laundering or the other charges. According to his report, from Trooper Hilton's two months of training in the field and from the experience of his partner, people who have been charged with possession of a controlled substance and are carrying or concealing a controlled substance do not want to talk about their criminal history. Defendant explained some details of his criminal history.

Trooper Hilton asked Defendant if he had anything illegal such as drugs or weapons in his car. (Exh. 1, 22:02:09 to 22:02:25). Defendant denied having any such items, referencing his mom being in the vehicle. Defendant admitted that he loaded the trunk of the car himself. (Exh. 1, 22:02:25 to 22:02:27). Trooper Hilton then asked if he could search the car, and Defendant stated, "sure can." (Exh. 1, 22:02:27 to 22:02:29).

Trooper Hilton testified officer safety was a consideration as he was questioning Defendant so he patted him down. Trooper Hilton did not have Defendant handcuffed at that time, and Trooper

Hilton still had Defendant's driver's license.[6] Trooper Hilton testified the stop was not finished.

After the pat-down of Defendant, the troopers asked Defendant's mother if she wanted to exit the car while they searched it. (Exh. 1, 22:03:35-36). They told her she could remain in the car or she could get out and stretch a little bit. She got out of the car and stood by the front passenger's door. Trooper Hilton searched the interior, back seat area of the car, while Trooper Vera searched the trunk of the car. (Exh. 1, 22:03:36 to 22:07:39).

Trooper Vera found suspected cocaine in a black bag in the trunk. The suspected cocaine was wrapped in black electrical tape and grey duct tape. (Exh. 2 at pg. 3). Defendant was arrested. (Exh. 1, 22:07:40 to 22:08:14). Defendant questioned what was happening. Trooper Hilton began reading Defendant his *Miranda* Rights, but before he could finish, Defendant stated that the bag with the cocaine was his. (Exh. 1, 22:07:04 to 22:08:14). Trooper Hilton again started and completed reading Defendant his *Miranda* Rights, and confirmed that Defendant understood his rights. (Exh. 1, 22:08:26 to 22:09:25). Defendant again admitted that the bag containing the cocaine was his. (Exh. 1, 22:08:26 to 22:09:25).

Defendant was placed in the front seat of the patrol car and was transported to the Texas Department of Public Safety office in Texarkana, Texas to be interviewed by DPS Narcotics Sergeant Richard Greer. (Exh. 2 at pgs. 3-4). After Defendant and his mother were interviewed by Sgt. Greer, Defendant's mother was released and Defendant was transported to the Bi-State Justice Center and booked in. The substance found in Defendant's rental car tested positive for cocaine.

---

[6] Trooper Hilton testified he did not give Defendant a traffic warning that night because Defendant was arrested after the search.

# IV.

# APPLICABLE LAW

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that police officers may detain individuals briefly on the street, even though there is no probable cause to arrest them, as long as they have a reasonable suspicion that criminal activity is afoot. Reasonable suspicion under *Terry* must be based on "specific and articulable facts," and the facts must "be judged against an objective standard." *Id*. at 21, 88 S.Ct. at 1880. In *Michigan v. Long*, 463 U.S. 1032 (1983), the Supreme Court applied the principles of *Terry v. Ohio*, 392 U.S. 1 (1968) to automobile searches.

Pursuant to the Fourth Amendment, the government violates a defendant's constitutional rights by executing a search or seizure without probable cause. *U.S. v. Kye Soo Lee*, 898 F.2d 1034, 1039 (5th Cir.1990), *cert. denied*, 506 U.S. 1083 (1993). When a warrantless search or seizure is conducted, the burden shifts to the government to justify the warrantless search. *U.S. v. Chavis*. 48 F.3d 871, 872 (5th Cir.1995).

The stopping of a vehicle and the detention of its occupants is a seizure within the meaning of the Fourth Amendment. *U.S. v. Shabazz*, 993 F.2d 431 (5th Cir.1993). But, where there is a reasonable and articulable suspicion that a person has committed or is about to commit a crime, limited searches and seizures are permissible under the Fourth Amendment despite the lack of probable cause. *See Kye Soo Lee*, 898 F.2d at 1039 (referring to the reasonable suspicion standard enunciated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). To determine whether a seizure has exceeded the scope of a permissible *Terry* stop, a court must undertake a two-step inquiry: 1) whether the officer's action was justified at its inception; and 2) whether it was

reasonably related in scope to the circumstances that justified the interference in the first place. *See U.S. v. Kelly*, 981 F.2d 1464, 1467 (5th Cir.1993), *cert. denied*, 508 U.S. 944 (1993).

## V.

## DISCUSSION

A.  **Whether Trooper Hilton's action was justified at its inception**

Regarding the first part of the *Terry* test, Defendant acknowledges that he was stopped for a speeding violation, justifying Trooper Hilton's action in pulling over Defendant. The Court finds the initial traffic stop was valid because Troopers Hilton and Vera observed Defendant's vehicle violate the traffic laws of the State of Texas.

B.  **Whether Trooper Hilton's actions during the stop were reasonably related in scope to the circumstances which may have justified the stop in the first place**

Defendant asserts the continued detention of Defendant after the purpose of the initial stop was completed was not reasonably related in scope to the circumstances that justified the stop in the first place, violating the second part of the *Terry* test. But with regard to this second part of *Terry*, the Fifth Circuit Court of Appeals recently stated:

> an officer may examine drivers' licenses and vehicle registrations and run computer checks as part of his investigation of the circumstances that originally caused the stop. He may also ask about the purpose and itinerary of the occupants' trip as part of this investigation, because we consider these questions to be reasonably related in scope to his investigation of the circumstances that caused the stop. Additionally, we have held that an officer may ask questions on subjects unrelated to the circumstances that caused the stop, so long as these unrelated questions do not extend the duration of the stop. The reasoning behind this rule is that the Fourth Amendment protects against detention, not questioning. Thus, no Fourth Amendment harm is done where the officer asks the occupants of a vehicle questions that are unrelated to his reason for stopping the vehicle while waiting for routine computer checks to be processed.

*United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010)(internal citations omitted).

Thus, while investigating and issuing a warning ticket for the speeding violation, Trooper Hilton was entitled to ask for Defendant's driver's license and rental car agreement and to inquire as to the occupants' travel. These were all questions reasonably related in scope to his investigation of the circumstances that caused the stop.

Additionally, an officer may temporarily detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may have occurred. *U.S. v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). The suspicion required to justify such a detention need not rise to the level of probable cause but must be based on more than an unparticularized suspicion or hunch. *Id*. Here, several circumstances during the stop entitled the troopers to detain Defendant until both troopers' suspicions were satisfied.

First, from his review of the rental car agreement, Trooper Hilton noticed the vehicle was rented on December 15, 2008 at 4:18 p.m. in Springfield, Ohio. The trip from San Antonio to Springfield, Ohio is approximately 1,300 miles, and the vehicle had been rented for only two days, being due back on December 17, 2008 at 3:00 p.m. In his report, Trooper Hilton noted that the vehicle was rented for 48 hours, and the drive would have taken approximately 36 hours round trip.

Second, in his initial conversation with Defendant, Trooper Hilton observed that Defendant was showing signs of nervousness; his voice was shaky; he could not keep his hands still; and he would take his hands in and out of his pockets, stretching to relieve stress, rubbing his face, and avoiding eye contact. (Exh. 2 at pg. 3).

Third, after briefly conferring with Trooper Vera and while Trooper Vera was still checking Defendant's information, Trooper Hilton asked Defendant and his mother additional questions about their travel, and he received conflicting information. Defendant explained that he was taking his

11

mother back home to Springfield, Ohio from Converse, Texas, near San Antonio. When Trooper Hilton asked Defendant how his mother got to Texas, Defendant said he had picked her up and brought her down to Texas to visit for a few days. When Trooper Hilton asked Defendant's mother how she got to Texas, she replied that she had "flown here."

While Trooper Hilton was still speaking with Defendant's mother, Trooper Vera approached Defendant and asked if he was from Ohio, and Defendant confirmed this fact. Trooper Vera remained with Defendant by the patrol car and asked Defendant further questions which Defendant asserts were unrelated to the purpose of the traffic stop. According to Defendant, Trooper Vera never produced or provided Defendant with a warning citation as promised by Trooper Hilton. According to Defendant, the primary reason for the stop was over at that point; Trooper Hilton had ascertained that Defendant was okay to drive, and he had already determined to give Defendant a warning.

However, Trooper Hilton testified at the hearing that Defendant's level of nervousness was an issue from the beginning of the stop. Trooper Hilton testified that unlike most people who are advised a warning will be issued, Defendant's level of nervousness did not go down even after Defendant was advised that he would be receiving a warning. Trooper Hilton testified he was not sure what was going on, but he was suspicious. To dispel this reasonable suspicion, Trooper Hilton asked Defendant and his mother additional questions about their travel, and he got conflicting answers. Trooper Hilton's suspicions were not dispelled but were increased.

After the conversations with Defendant and his mother, the troopers regrouped in their patrol car. At some point, the license and criminal checks had been completed. Back in the patrol car, Trooper Vera told Trooper Hilton about Defendant's criminal history, and Trooper Vera indicated he observed Defendant had been acting nervous during Trooper Hilton's initial conversation with

12

Defendant. The troopers also discussed the rental agreement and the discrepancies in Defendant's statements as to how his mother had arrived in Texas.

Based on his experience, Trooper Vera was suspicious because the car was rented in Ohio three days before the stop. What is more, Defendant's mother had explained that she had flown to Texas whereas Defendant had said he had picked her up in Ohio, and this discrepancy was a significant factor in the investigation.

Defendant asserts Trooper Hilton had decided to give Defendant a warning until he conferred with Trooper Vera inside the patrol car. Defendant takes issue with Trooper Hilton's reliance on his more experienced partner, pointing out that Trooper Vera had remained in the car during Trooper Hilton's initial conversation with Defendant. However, in determining whether reasonable suspicion existed to justify a defendant's continued detention, the court must look at the totality of the circumstances and consider the *collective knowledge and experience of the officers involved. U.S. v. Holloway*, 962 F.2d 451, 459 & n. 22 (5th Cir.1992)(emphasis added). Although Trooper Vera had limited contact with Defendant during Trooper Hilton's initial conversation with Defendant, Trooper Vera was observing Trooper Hilton, who was in charge, making sure he was doing things correctly. According to Trooper Vera, he specifically observed Defendant stretch in a big manner, presumably in an attempt to relieve stress. Trooper Vera described such a stretch as a "felony stretch" based on his experience with law enforcement.

Given Trooper Vera's extensive training in drug interdiction, Defendant's and his mother's conflicting responses regarding their travel, together with Defendant's level of nervousness, gave rise to suspicions unrelated to the traffic offense. The troopers properly broadened their inquiry. The totality of the circumstances known to the troopers met the requisite level of reasonable suspicion

under *Terry* to detain Defendant until they had satisfied their suspicions.

The length of the entire detention was reasonable in light of the suspicious facts that Troopers Hilton and Vera had observed. The police must diligently pursue a means of investigation that is likely to confirm or dispel their suspicions quickly. *United States v. Sharpe,* 470 U.S. 675, 685 (5th Cir. 1985). In this case, Trooper Vera discovered the cocaine within sixteen minutes of Trooper Hilton's stopping Defendant's rental car. The length of the entire stop was not unreasonable given the circumstances.

In sum, the facts Troopers Hilton and Vera observed during their investigation of Defendant's speeding offense created reasonable suspicion that additional criminal activity was afoot, and the length of the entire detention and the scope of his investigation were reasonable in light of the suspicious facts the troopers had observed. Therefore, Defendant's argument that the search violated the Fourth Amendment is without merit.

**C.      Whether Defendant's consent was valid**

The Court has concluded there was no Fourth Amendment violation in this case. However, even assuming a Fourth Amendment violation, Defendant asserts his consent to search was not freely and voluntarily given as it was obtained contemporaneously with the stop, and there were no intervening circumstances that occurred in between the stop and the obtaining of the consent.

The Fourth Amendment generally prohibits the government from executing a search or seizure without probable cause. *See United States v. Kye Soo Lee*, 898 F.2d 1034, 1039 (5th Cir.1990). If a warrantless search or seizure is conducted, the burden shifts to the government to justify the warrantless search. *See United States v. Chavis*, 48 F.3d 871, 872 (5th Cir.1995).

However, a search is permissible without probable cause if consent is obtained prior to the search.

A person may give consent to a search of his person, property, or vehicle. The Court should consider six factors when evaluating the voluntariness of consent: (1) the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *See United States v. Cooper*, 43 F.3d 140, 144 (5th Cir. 1995); *citing United States v. Ruigomez*, 702 F.2d 61, 65 (5th Cir.1983); *United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir.1993). No one factor is dispositive in determining the voluntariness of consent. *See Cooper*, 43 F.3d at 144.

While Defendant gave consent to Troopers Hilton and Vera to search the vehicle, he contends his consent was not voluntary and was not an independent act of free will. Defendant further asserts no intervening circumstances occurred between the illegal detention and the consent. The Court notes that Defendant was in custody when consent was given. Although he had not been handcuffed, Trooper Hilton had not returned Defendant's driver's license nor had the troopers told Defendant he was free to leave. Even so, there is no evidence of the presence of coercive police procedures being used, and Defendant cooperated with the troopers.

Although Trooper Hilton read Defendant his *Miranda* rights after asking for and receiving Defendant's consent to search, it is not required that an officer advise a suspect of their right to refuse consent to a search for the consent to be voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 231 (1973). Even if a defendant was unaware of his right to refuse consent, an individual's subjective

knowledge of the right is not a prerequisite to voluntary consent. *Id*. at 234. Here, although Trooper Hilton did not explicitly tell Defendant he had the right to refuse consent to search the car, it did not negate the voluntariness of the consent given. Importantly, there is no evidence Defendant was unaware of his right to refuse consent. Finally, there is no evidence before the Court to indicate that Defendant lacks education or average intelligence or that Defendant believed that no incriminating evidence would be found.

There was no coercion or undue delay before Defendant gave his consent to have his car searched. Furthermore, there was no unreasonable detention that would have made Defendant's consent involuntary. From the time Defendant's car was stopped to the time he gave consent to search his car only a little more than eleven minutes had passed. It then only took Trooper Vera a little more than five minutes to find the cocaine.

The United States Supreme Court has held that the "touchstone of Fourth Amendment analysis is reasonableness." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). In this case, there was nothing unreasonable in the troopers' actions. Based on the foregoing, the Court finds Defendant's consent was voluntary.

## VI.

## RECOMMENDATION

Based on the foregoing, it is hereby

**RECOMMENDED** that Second Amended Defendant's Motion to Suppress Evidence (Docket Entry # 26) be **DENIED.**

Within fourteen (14) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations contained in the report. A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United States Auto Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

**SIGNED this 23rd day of November, 2010.**

*/s/ Caroline M. Craven*
CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE